## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    **Plaintiff,**<br><br>v.<br><br>ANDREW M. MIDDLEBROOKS and EIA ALL WEATHER ALPHA FUND I PARTNERS, LLC,<br><br>    **Defendants, and**<br><br>EIA ALL WEATHER ALPHA FUND I, LP, EIA ALL WEATHER ALPHA FUND PARTNERS II, LLC, and SHOP STYLE SHARK, LLC,<br><br>    **Relief Defendants.** | Case No.<br><br>JURY TRIAL DEMANDED<br><br>UNDER SEAL |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff United States Securities and Exchange Commission ("SEC"), for its

Complaint against defendants Andrew M. Middlebrooks ("Middlebrooks") and

EIA All Weather Alpha Fund I Partners, LLC ("EIA") (collectively, the

"Defendants"), and relief defendants EIA All Weather Alpha Fund I, LP (the

"Fund"), EIA All Weather Alpha Fund Partners II, LLC (a/k/a EIA All Weather

Alpha Fund II Partners, LLC) ("EIA II"), and Shop Style Shark, LLC ("Shop Style") (collectively, "Relief Defendants"), alleges as follows:

## INTRODUCTION

1.      The SEC brings this emergency enforcement action to stop an ongoing offering fraud and misappropriation of investor assets by Defendants Middlebrooks and EIA, an investment adviser that Middlebrooks owns and controls.

2.      From at least mid-2017 through the present (the "Relevant Period"), Middlebrooks, through EIA, solicited and raised approximately $39 million from over 100 investors for a private fund that he manages, Relief Defendant EIA All Weather Alpha Fund I, LP, which Defendants claim to be a long/short equity hedge fund.

3.      From the beginning of the Relevant Period, Middlebrooks and EIA made numerous false and misleading statements to Fund investors and prospective investors, wildly misstating the Fund's performance and claiming that its financials were audited when they were not. Middlebrooks and EIA represented to investors and prospective investors that the Fund had extremely successful trading performance, with cumulative returns upwards of 2,500% from the Fund's

inception through January 2022, when, in reality, the Fund suffered catastrophic trading losses of approximately $27 million.

4.      Additionally, since inception, EIA and Middlebrooks falsely represented that the Fund had an auditor and would provide audited financial statements to investors. In reality, no audit was ever performed and, in early 2022, EIA and Middlebrooks fabricated financial statements and an audit report that they then provided to existing and prospective Fund investors.

5.      Middlebrooks and EIA repeatedly lied and engaged in deceptive conduct throughout the Relevant Period, including making over $9 million in Ponzi-like payments, to cloak the Fund's abysmal performance. Specifically, during the Relevant Period, when some investors sought to redeem their investments, in order to avoid disclosing that their investments had been misappropriated or lost through trading activity, Defendants met redemption requests using other investors' funds, paying not only the original amount invested despite the catastrophic trading losses, but also the phony returns Defendants had claimed.

6.      Middlebrooks also has misappropriated investor money, by, among other things, transferring at least $470,000 to his wife's business, making over $750,000 in transfers to his personal bank account, and using $64,000 of investor

money to pay for jewelry. Middlebrooks's losing trading strategy coupled with his misappropriation has resulted in a near total loss of investor funds.

7.     By engaging in this conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2), 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 17 C.F.R. § 275.206(4)-8. Unless restrained and enjoined, Defendants will continue to violate the federal securities laws.

8.     Relief Defendants the Fund, EIA II, and Shop Style have each received illicit proceeds from the Defendants' fraud to which they have no legitimate claim and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.

9.     The SEC seeks, among other things, preliminary and permanent injunctions and conduct-based injunctions against Defendants, disgorgement of all Defendants' and Relief Defendants' ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and third-tier civil penalties against Defendants pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. §78u(d)(3), and

4

Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e). In addition, the SEC seeks emergency temporary relief to, among other things, prohibit Defendants from continuing to violate the securities laws, freeze the assets of Defendants and Relief Defendants, require them to preserve documents, and provide a sworn accounting.

## DEFENDANTS

10.     **Andrew M. Middlebrooks**, age 30, was a resident of the Detroit, Michigan metro area from approximately 2017 through February 2020, but now claims to be a resident of Dallas, Texas. In testimony during the SEC's investigation, Middlebrooks repeatedly asserted his Fifth Amendment right against self-incrimination.

11.     **EIA All Weather Alpha Fund I Partners, LLC**, is a Delaware limited liability company formed on or about June 12, 2017, with its principal place of business in Novi, Michigan. Middlebrooks is the sole owner and member-manager of EIA, its Chief Executive Officer ("CEO"), Chief Investment Officer ("CIO"), and serves as the portfolio manager of EIA. EIA is the investment adviser and general partner of the Fund. EIA has also conducted business under the names "EIA All Weather Alpha Partners," "EIA All Weather Alpha Partners, LLC," "Eia Alpha Partners Fund Management," and "Excellence In Investing In Action Alpha

Partners Fund Management LLC." The term "EIA" incorporates these additional names under which EIA acted or purported to act. EIA is not registered with the SEC or any state as an investment adviser.

**RELIEF DEFENDANTS**

12.    **EIA All Weather Alpha Fund I, LP** ("the Fund"), is a Delaware limited partnership, formed on or about June 13, 2017. It is a pooled investment vehicle that has sold limited partnership interests to investors. The Fund's assets are managed by EIA, which also serves as its general partner. EIA and Middlebrooks have also referred to the Fund as "Excellence in Action (EIA) All Weather Alpha Fund I, LP," "EIA All Weather Alpha Fund," and "EIA All Weather Alpha Partners Fund I, LP" in various Fund documents and marketing materials. The term "the Fund" incorporates these additional names under which the Fund acted or purported to act. The Fund has bank and brokerage accounts in its name and received proceeds of the fraud. At least $23 million of investor funds have been transferred into one or more accounts in the name of the Fund. The Fund has no legitimate claim to these funds.

13.    **EIA All Weather Alpha Fund Partners II, LLC** ("EIA II"), is a Delaware limited liability company, formed on or about October 24, 2019, with its principal place of business in Detroit, Michigan. Middlebrooks is the sole member

of EIA II. EIA II has also conducted business under the name "EIA All Weather Alpha Fund II Partners, LLC." The term "EIA II" incorporates this additional name under which EIA II acted or purported to act. EIA II has accounts in its name and received proceeds of the fraud. At least $185,215 has been transferred into one or more accounts in the name of the EIA II. EIA II has no legitimate claim to these funds.

14.     **Shop Style Shark, LLC** ("Shop Style"), is a Texas limited liability company formed on or about June 15, 2021, with its principle place of business in Austin, Texas. Dionne T. Middlebrooks is the managing member of Shop Style. Dionne Middlebrooks has been Middlebrooks's wife since November 2018. From approximately October 9, 2017 through August 10, 2021, Shop Style was a Michigan limited liability company. Shop Style has at least one bank account in its name and received proceeds of the fraud. At least $470,250 has been transferred into one or more accounts in the name of Shop Style. Shop Style has no legitimate claim to these funds.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa,

and Sections 209(d) and 214(a) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and 80b-14(a).

16.     The Court has personal jurisdiction over Defendants and Relief Defendants, and venue is proper in this judicial district, because many of the acts and transactions constituting violations of the Securities Act, Exchange Act, and Advisers Act occurred in this district. In addition, from at least mid-2017 through February 2020 Middlebrooks resided in this district, EIA, the Fund, and EIA II have their principal places of business in this district, and Shop Style at least until 2021 had its principal place of business in this district, and one or more investors in the Fund reside in this district.

17.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, including soliciting investors located in other states and obtaining funds from those investors through wire transfers in interstate commerce.

## FACTS

### I.   BACKGROUND

#### A.   The Formation of EIA and the Fund, Middlebrooks's Control of Both, and Authority Over Fund Materials

18.     EIA and the Fund were formed in June 2017.

19.     Middlebrooks and EIA market the Fund as a "quantitative relative value fund" and a "quantitative long/short equity fund which exploits inefficiencies in the global equity market to achieve attractive absolute returns."

20.     According to the Fund's June 2017 Private Placement Memorandum ("PPM"), which was provided to prospective investors throughout the Relevant Period:

   a.   EIA "serves as the Fund's Investment Manager" and is "responsible for managing the investment of the Fund's assets."

   b.   EIA is also the Fund's general partner and "exercises ultimate authority over the Fund and is responsible for engaging service providers for the Fund."

   c.   EIA is "controlled by Andrew Middlebrooks" and Middlebrooks "serves as portfolio manager" for EIA and "manages the Fund's securities portfolio and operations on behalf of" EIA.

21.     Throughout the Relevant Period, Middlebrooks has owned and controlled EIA, served as EIA's CEO and CIO, and has had signatory authority over all EIA and Fund bank and brokerage accounts. Because Middlebrooks has owned and controlled EIA throughout the Relevant Period, his actions and scienter are attributed to EIA.

22.     Throughout the Relevant Period, Middlebrooks has controlled EIA, the general partner and investment manager of the Fund, and operated the Fund on behalf of EIA.

23.     Middlebrooks, as the sole owner and managing-member of EIA, who exercised ultimate authority over the Fund, was the control person for the Fund and exercised ultimate authority over and was responsible for the content of all the documents, communications, and information provided to investors and prospective investors, including the following: EIA representatives' oral representations; EIA representatives' emails; investor presentations ("Investor Presentations"); a PPM; one-page monthly summaries of the Fund that showed its purported monthly performance from January 2017 forward ("Performance Sheets"); a Fund limited partnership agreement ("LPA"); subscription documents for investment in Fund limited partnership interests ("Subscription Documents");

EIA's website; Middlebrooks's LinkedIn page; and monthly investor account statements made available through an investor internet portal.

24.     Middlebrooks either prepared or directed the preparation of each document or had ultimate authority over the content of each document or oral representation, and was responsible for the dissemination of the documents and other communications described in this Complaint.

**B.     Defendants Raised Approximately $39 Million through the Sale of Limited Partnership Interests in the Fund.**

25.     Since at least May 2017, Middlebrooks and EIA solicited investors for the Fund.

26.     EIA, through Middlebrooks, EIA employees, and individuals associated with EIA, solicited investors and prospective investors. Middlebrooks and others who worked with him at times held telephone calls and video conference calls to discuss the Fund with prospective investors before emailing offering materials, subscription information, and wire information to prospective investors.

27.     At various points during the Relevant Period, Middlebrooks and EIA solicited investors and prospective investors through EIA's website, which described EIA's investment strategy for the Fund and other information about its

operations. Additionally, at various points during the Relevant Period, Middlebrooks maintained a LinkedIn account that contained background information on the Fund.

28.     Middlebrooks also solicited investors and prospective investors by listing the Fund through a hedge fund data service that touted its ability to provide information about the Fund to over 170,000 fund managers, investors, placement agents, service providers, advisors, and other industry professionals. In doing so, Middlebrooks provided the hedge fund data service certain information, including information regarding the Fund's purported performance.

29.     Each investor in the Fund was offered and sold a limited partnership interest in the Fund.

30.     EIA emailed offering documents to investors and prospective investors including: Investor Presentations; a PPM; an LPA; and Subscription Documents.

31.     To complete a Fund investment, investors typically signed various Subscription Documents and sent them back to EIA. According to the Subscription Documents, investors in the Fund were provided a copy of the PPM and LPA.

32.     The PPM and LPA each describe numerous aspects of the structure, operation, and management of the Fund, including how the Fund must use investor

money—to invest in a wide range of investments, including securities, using its proprietary analytic framework called "Contextual Alpha Modeling" to drive its investment strategy—and what fees will be charged against the Fund's assets. The PPM and LPA provide for management fees that vary between 1.5% and 2.0% per year of an investor's capital contribution, depending on the length of time the capital contribution remains invested, and a performance allocation of up to 20% of the net realized and unrealized appreciation in value of the Fund's assets at the end of each year.

33.     Investors typically made their investments in the Fund by executing wire transfers from their financial institutions to EIA's bank account.

34.     From at least May 2017 through April 2022, Middlebrooks and EIA raised approximately $39 million from over 100 investors located across the country who purchased limited partnership interests in the Fund.

**C.     Middlebrooks and EIA Misappropriated and Misused Investor Money.**

35.     Defendants misappropriated at least $1.6 million of investor money from EIA's bank and brokerage accounts that held investor funds.

36.     Middlebrooks and EIA instructed investors to send their investments in the Fund to EIA's bank account. EIA's bank account received approximately

$39 million from investors. This bank account received approximately only $640,000 from non-investor sources.

37.    Rather than transfer investor money to the Fund's brokerage account to trade, in many instances EIA and Middlebrooks misappropriated the investor money before it ever reached an account in the name of the Fund.

38.    For example, on March 10, 2022, an investor wired $74,552 into EIA's bank account for the purpose of investing in the Fund. Prior to that deposit, EIA's bank account balance was $3,065. The investor's funds were not transferred to any of the Fund's or EIA's brokerage accounts. Rather, on March 11, 2022, Middlebrooks sent $7,500 to himself and from March 11 to March 17, 2022, he sent three payments totaling $27,500 to his wife's business, Relief Defendant Shop Style. There were no other intervening deposits from March 10 through March 17, 2022.

39.    On November 6, 2017, an investor wired $9,975 into EIA's bank account for the purpose of investing in the Fund. Prior to that deposit, EIA's bank account balance was $442. The investor's funds were not transferred to any of the Fund's or EIA's brokerage accounts. Rather, from November 8 through 14, 2017, Middlebrooks sent $2,500 to himself and sent four payments totaling $4,200 to pay

credit cards. There were no intervening deposits from November 6 through

November 14.

40.     From May 2017 to at least April 2022, Middlebrooks directed

payments from EIA bank and brokerage accounts containing investor funds to his

personal bank accounts in a haphazard fashion totaling at least $765,988.

41.     Additionally, Middlebrooks transferred at least $470,250 from EIA's

bank account to his wife's business, Relief Defendant Shop Style, and transferred

$185,215 to Relief Defendant EIA II, a different entity than the Fund investors

invested in, but which is an entity owned and controlled by Middlebrooks.

42.     Middlebrooks also used investor money to pay other expenses not

allowed to be charged to the Fund or its investors under the terms of the LPA, such

as to make credit card payments and to purchase over $64,000 of jewelry.

43.     In total, Middlebrooks's payments to himself and transfers to Shop

Style and other persons and entities unrelated to Fund operations or not permitted

to be charged to the Fund or its investors totaled at least $1.6 million. This exceeds

any amounts to which he could claim to be entitled to as management or

performance fees even if the entire EIA enterprise were not a fraud. Further, this

misuse of Fund assets was contrary to the Fund's offering documents.

44.     Defendants have paid approximately $9.5 million in Ponzi-like payments to investors as purported partial or total redemptions from the Fund. During the Relevant Period, some investors sought to redeem their investments. In order to conceal that their investments had been misappropriated or lost, Defendants redeemed those investments, paying not only the original amount contributed despite the catastrophic trading losses, but also the phony returns Defendants had claimed. But, as the investment had been misappropriated or lost, Defendants redeemed these investors' investments by making Ponzi-like payments to them, providing them not with their principal and actual returns, but money invested by later investors.

45.     In addition to misappropriating money and making Ponzi-like payments, Defendants have lost approximately $27 million through trading, after transferring approximately $31M of investor funds from EIA's bank account to brokerage or other investment accounts. Defendants' losing trading strategy, misappropriation, and Ponzi-like payments have resulted in a near total loss of investor funds. The flow of investor funds looks like this:



## II.   DEFENDANTS MADE MATERIAL MISSTATEMENTS AND OMISSIONS WHEN SOLICITING INVESTMENTS IN THE FUND.

46.    Defendants made numerous material false and misleading statements and omissions in soliciting investments in the Fund regarding, among other things, the Fund's performance, the amount of assets in the Fund, the Fund's purported auditor and advisory board, and the use of investor funds.

**A.    Defendants Misrepresented the Fund's Performance.**

47.    Throughout the Relevant Period, EIA and Middlebrooks misrepresented the Fund's performance in order to solicit new investors and to lull current investors into maintaining their Fund investment and induce them into investing more. Each year, and in most months, the Fund suffered significant losses. However, despite these losses, Middlebrooks and EIA created and distributed numerous documents claiming the Fund had exceptionally positive investment performance.

**a.    Performance Sheets and Investor Presentations**

48.    During the Relevant Period, Middlebrooks and EIA made false and misleading statements regarding the financial performance of the Fund in one-page monthly Performance Sheets and Investor Presentations they provided to investors and prospective investors.

49.    Investor Presentations, whose titles indicate they were prepared quarterly (e.g., "Investor Presentation Q1 2020") and were sent to investors, represent the Fund's cumulative return and winning months percentage that looks like this (from the Q1 2020 Investor Presentation):

**TRACK RECORD[1]**

- 476.81% cumulative return
- 81.82% Winning Months (%)
- 3.99 Sharpe ratio

Represents data for EIA as of September 30, 2019.  Please see disclosures on page 18 for additional information.

50.     In reality, EIA and the Fund had lost money every year.

51.     The Performance Sheets, which appear to have been created on a monthly basis and were provided to prospective and existing investors, purported to provide total return since inception, three-month return, year-to-date return, winning months (%), and updated monthly performance results of the Fund that looked like this (from the December 2021 Performance Sheet):

# EIA ALL WEATHER ALPHA FUND I, L.P.



## KEY HIGHLIGHTS

Firm and Fund founded in 2017, EIA is the first minority owned hedge fund in Detroit, Michigan.

We utilize a multi-factor investment process leveraging both bottom up fundamentals and macroeconomic analysis to identify potential themes and investments. The Fund uses GLM Analytics, our proprietary quantitative research platform to identify opportunities.

2017 Preqin Rankings

## PERFORMANCE

| 3M | 2021 |
|----|------|
| 11.32% | 86.66% |

Max DD
-6.00%

## Statistics

| | |
|---|---|
| Total return | 2,436.43% |
| Sharpe Ratio | 3.99 |
| Sortino Ratio | 2.98 |
| Winning Months (%) | 85.00% |
| Correlation vs. S&P 500 TR | 0.65 |

## MONTHLY PERFORMANCE

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Year |
|---|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|------|
| 2017 | 7.34 | 1.30 | 2.83 | 14.40 | 12.58 | 0.65 | 2.33 | 7.20 | 11.31 | 10.64 | 7.27 | 3.43 | 117.25 |
| 2018 | 7.94 | -0.96 | 0.58 | 7.26 | 11.08 | 5.20 | 5.33 | 4.11 | 11.09 | -1.79 | -1.03 | -3.30 | 54.31 |
| 2019 | 12.51 | -0.42 | -0.37 | -0.52 | 4.39 | 16.37 | 3.11 | 8.97 | 13.52 | 1.48 | 0.63 | -2.14 | 71.94 |
| 2020 | 4.14 | 11.24 | 22.48 | 4.68 | 1.83 | 3.89 | 13.15 | 7.15 | 6.92 | 8.04 | 4.48 | 2.53 | 135.74 |
| 2021 | 20.93 | 3.58 | 9.96 | 4.57 | 14.52 | 3.91 | -4.22 | 1.31 | 0.82 | 5.26 | 1.08 | 4.63 | 86.66 |

52.    This table, which was iteratively and continually updated in the monthly Performance Sheets sent to investors, showed that the Fund had yearly positive returns of 117.25% (2017), 54.31% (2018), 71.94% (2019), 135.74% (2020), 86.66% (2021). In reality, the Fund had negative returns, incurring net losses of approximately $275,000 in 2017, $737,000 in 2018, $1.6 million in 2019, $13.6 million in 2020, and $9.8 million in 2021. It also incurred losses of

approximately $1 million in 2022 through April. These trading losses were in addition to the funds Defendants misappropriated and misused to make Ponzi-like payments.

53.    EIA provided these Performance Sheets and Investor Presentations to investors and prospective investors throughout the Relevant Period. Other examples of Performance Sheets and Investor Presentations sent to investors and prospective investors that falsely reported the Fund's performance include the following:

     a.  A January 2018 Performance Sheet represented that the Fund had a total positive return of 117.25% in 2017. In reality, the Fund incurred net losses of approximately $275,000 in 2017, indicating a negative return on investment.

     b.  An October 2019 Performance Sheet represented that the Fund had a total positive return of 54.31% in 2018. In reality, the Fund incurred net losses of approximately $737,000 in 2018, indicating a negative return on investment.

     c.  An April 2020 Performance Sheet represented that the Fund had a total positive return of 71.94% in 2019. In reality, the Fund incurred

net losses of approximately $1.6 million in 2019, indicating a negative

return on investment.

d.  A February 2021 Performance Sheet represented that the Fund had a

total positive return of 135.74% in 2020. In reality, the Fund incurred

net losses of approximately $13.6 million in 2020, indicating a

negative return on investment.

e.  A December 2021 Performance Sheet represented that the Fund had a

total positive return of 86.66% in 2021. In reality, the Fund incurred

net losses of approximately $9.8 million in 2021, indicating a negative

return on investment.

f.  A January 2022 Investor Presentation represented that the Fund had a

total positive return of 2,509% since inception. In reality, the Fund

continued to lose money, losing nearly $26 million from 2017 through

2021, thus indicating a negative return on investment.

54.     On May 21, 2020, an individual associated with EIA, under the

authority of Middlebrooks, sent an email to Declarant Investor 1, who had not yet

invested in the Fund, that copied Middlebrooks and others and attached documents

including an April 2020 Performance Sheet and a Q1 2020 Investor Presentation.

55.     On or about May 29, 2020, Declarant Investor 1 made an initial $1 million investment in the Fund, in part, based on the performance return stated in these documents.

56.     In February 2021, an individual associated with EIA, under the authority of Middlebrooks, sent an email to Declarant Investor 2, who had not yet invested in the Fund, and attached a January 2021 Performance Sheet.

57.     The January 2021 Performance Sheet, consistent with other Performance Sheets, contained a table purporting to display the Fund's monthly and yearly performance. However, the table drastically overstated the Fund's performance. For example, in addition to the misrepresented yearly returns noted above, the table showed that the Fund had total positive return of 135.74% in 2020 and a cumulative total return since inception of 1,543.27%. In reality, the Fund incurred net losses of approximately $13.6 million in 2020, indicating a negative return on investment. And because the Fund had lost millions since inception, the cumulate total return number was false.

58.     In early April 2021, Declarant Investor 2 contacted EIA to inform it that he would invest in the Fund. On or around May 6, 2021, Declarant Investor 2 made an initial $1.6 million investment in the Fund.

59.     A reasonable investor would have understood from the statements regarding the Fund's performance in the Performance Sheets and Investor Presentations that EIA's trading of the Fund assets was extraordinarily profitable.

60.     In reality, each of these statements was false. EIA was actually losing money on its trading of Fund assets.

61.     Each of the above statements regarding the performance of the Fund was false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the performance of the Fund were false and misleading. Middlebrooks, as the sole owner, portfolio manager, and member-manager of EIA, which "serves as the Fund's Investment Manager" and is "responsible for managing the investment of the Fund's assets," and who had control of all the EIA and Fund bank and brokerage accounts, must have known the actual performance numbers and knew the performance number representations made to investors were false.

62.     The above misrepresentations regarding the performance of the Fund were material to investors and potential investors because, among other things, investors consider an adviser's historical performance to be relevant to the probability that an adviser may perform well in the future. Moreover, ongoing

performance updates, including the Performance Sheets, were material to investors' decisions to maintain or increase their investments in the Fund.

### b.    Falsified Monthly Account Statements

63.    Throughout the Relevant Period, Defendants also provided false performance results to investors in monthly individual statements disseminated to investors through an internet portal hosted by a third party. These monthly investor statements represented positive returns in the investors' accounts and ever-increasing account balances based on purported Fund gains from trading.

64.    A reasonable investor would have understood from the monthly individual statements that EIA's trading of the Fund assets was profitable and that their investments in the Fund were increasing in value.

65.    In reality, the purported Fund gains and investor balances reflected in the monthly individual statements were false. As described above, the Fund lost money trading each year from 2017 to the present.

66.    Based, in part, on these monthly account statements, certain investors, including, Declarant Investor 1 and Declarant Investor 2 continued to increase their investments in the Fund.

67.    Each of the above representations regarding the performance and value of investors' Fund investments reflected in the monthly individual statements

was false when made, and Defendants knew or were reckless in not knowing, and

should have known, that their statements concerning the performance and value of

investors' Fund investments in the monthly statements were false and misleading.

Middlebrooks, as the sole owner, portfolio manager, and member-manager of EIA,

which "serves as the Fund's Investment Manager" and is "responsible for

managing the investment of the Fund's assets," and who had control of all the EIA

and Fund bank and brokerage accounts, must have known the value of investors'

Fund investments in the monthly statements were false and misleading.

68.    These misrepresentations regarding the performance of investors'

Fund investments were material to investors because, among other things,

investors consider an investment's performance when deciding to redeem, hold, or

increase the amount of their investment.

**B.    Defendants Made Misrepresentations About the Use of Investor Monies.**

69.    Throughout the Relevant Period, in the PPM and LPA, Defendants

made material false and misleading statements and misrepresentations, and

omissions to investors and potential investors regarding the use of investor funds.

In these documents, Defendants represented that investor funds would be invested,

and that only limited, specified fees and expenses would be withdrawn by EIA.

26

70.     The LPA stated:

a.  "The Fund is organized to invest in a wide range of investments, including Securities (as hereinafter defined) and other related kinds of investments" using its "proprietary analytic framework called 'Contextual Alpha Modeling' to drive its investment strategy."

b.  It also provided for payment of a quarterly "Management Fee," "Investment Expenses," and "Operational Expenses."

71.     The PPM stated:

a.  "The Fund is offering limited partnership company interests representing equity partnership in the Fund to qualified investors ('**Interests**')."

b.  "**Investment Objective and Strategy:** The Fund is a quantitative relative value fund. The Fund's strategy is based on a utilizing a proprietary intellectual framework of forecasting, research, portfolio simulation and valuation models to evaluate when to buy or sell stocks using over 100 factors . . . The Investment Manager exercises a flexible strategy in the selection of investments, not limited by investment style or asset class . . . . the Limited Partnership Agreement does not limit the Investment Manager's authority to

27

invest in any particular type of security, instrument or issuer, nor limit the Fund's investment strategy or process to what is described above."

c. **Investment Strategy** . . . The Fund is a quantitative relative value fund. The Fund's strategy is based on a [sic] utilizing a proprietary analytic framework of forecasting, research, portfolio simulation and valuation models to evaluate when to buy or sell stocks using over 100 factors.

The Investment Manager uses a process called 'Contextual Alpha Modeling' to drive its investment strategy."

d. "As compensation for the management services provided to the Fund, the Investment Manager receives a management fee" of between 1.5% and 2% of Capital contributions per year. "The Management Fee is calculated and payable to the General Partner in arrears as of the last business day of each quarter."

e. "The Fund will directly pay, or reimburse the General Partner for, all Investment Expenses . . . . all Operational Expenses . . . ."

f. The PPM also provided for various Performance Allocations— percentages of net profits that would be allocated to EIA's account.

72.     A reasonable investor would have understood from Defendants'
statements that the money they invested would be used exclusively for trading in
order to generate profits, would not be misappropriated or misused, and no more
fees or expenses would be taken from their monies other than what was disclosed
in the PPM and LPA.

73.     Defendants' statements with regard to the use of investor proceeds
were false and misleading when made because Defendants intended to and did
misappropriate and misuse investor monies.

74.     Defendants took far more money from investors than was disclosed to
investors. While the Fund LPA does provide for managements fees and
performance allocations payable to EIA, the approximately $1.6 million
Middlebrooks took from the Fund through transfers of Fund assets to himself, his
wife's business and other entities, and payments of expenses not permitted by the
LPA, as well as Ponzi-like payments, vastly exceeded the amounts permitted by
the LPA. Throughout the Relevant Period, investors' individual accounts did not
appreciate in value in any year, and thus no performance allocations were due. This
misuse of Fund assets was contrary to the Fund's offering documents.

75.     Each of the above disclosures regarding Defendants' use of investor
proceeds and fees to be retained by EIA were false when made as soon as

Defendants began misappropriating funds, which occurred no later than May 2017. (*See supra* ¶¶ 37-43 (examples of misappropriation).) Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading.

76.     Defendants omitted to state material facts that were necessary to render their disclosures regarding their use of investor proceeds not misleading.

77.     The above misrepresentations and omissions as to the use of investor proceeds were material to investors and prospective investors because Defendants' misappropriation and misuse of money that was invested in the Fund would be material to any reasonable investor.

### C.     Defendants Made False and Misleading Statements about the Amount of Assets in the Fund.

78.     Defendants also repeatedly misrepresented the amount of assets in the Fund orally and in documents disseminated to investors and prospective investors.

79.     Defendants misrepresented to investors and prospective investors that the Fund had tens of millions to over $100 million in assets. Performance Sheets represented that the Fund had "AUM [Assets Under Management]" of "$4 million" by January 2018, "$8 million" by April 2018, "$17 million" by October 2019,

"~$25 million" by April 2020, "~$50 million" by February 2021, and "~$100 million" in December 2021.

80.     Further, Performance Sheets and Investor Presentations represented Fund performance each month since January 2017, and a cumulative performance return since January 2017, implying the Fund had assets starting in January 2017, when in reality, the Fund did not exist until June 2017.

81.     Middlebrooks orally represented to certain investors that the Fund had "AUM" of "$110 million" in February or March 2022 and "$130 million" in March 2022.

82.     Defendants sent to investors and prospective investors in early 2022 purportedly audited financial statements as of December 31, 2020, representing that the Fund had assets of $139,071,427. In reality, the Fund's bank and brokerage accounts reflected investments and cash totaling approximately $5.4 million as of December 31, 2020, with no evidence of any other assets.

83.     Records show that Fund AUM never exceeded $7.2 million at any time and the Fund suffered trading losses and expenses, making Defendants' representations of the amounts of Fund assets false from as early as January 2018 through the present. Additionally, records show that statements purporting to show

that the Fund had any assets starting in January 2017 were false, as no investor

money was received until May 2017.

84.     A reasonable investor would have understood from these statements

that the Fund had assets in the amounts contained in the disclosures and that the

Fund had assets since at least January 2017.

85.     Each of the above disclosures were false when made, and Defendants

knew or were reckless in not knowing, and should have known, that their

statements were false and misleading.

86.     The above misrepresentations regarding assets of the Fund and the

amount of its AUM were material to investors and potential investors because,

among other reasons, the amount of the Fund's assets indicated that other investors

had analyzed the Fund and determined that it was an attractive investment, and the

Fund's substantial assets signaled that the operations of EIA and the Fund were

sustainable.

**D.      Defendants Made False and Misleading Statements about an Audit of the Fund's Financial Statements and the Fund's Purported Auditor.**

87.     Throughout the Relevant Period, Defendants falsely represented to

investors that the Fund engaged outside auditors to audit its financial statements

and that its financial records would be audited.

88.     The LPA provides that the books and records of the Fund would be audited as of the end of each fiscal year by an independent accounting firm. The LPA also represented that as soon as practicable after an audit and, in no event later than 120 days after the fiscal year end, the Fund would mail to each limited partner a copy of the audited financial statements prepared for the Fund.

89.     These representations were false because an audit of the Fund was never completed.

90.     Defendants also misrepresented that the Fund had an audit firm.

91.     Numerous Investor Presentations and Performance Sheets throughout the Relevant Period, which EIA and Middlebrooks continued to provide to investors and prospective investors at least through March 2022, state that the Fund's Auditor is "Audit Firm 1 or Audit Firm 2" or that "Audit Firm 1" was the Fund's auditor. Defendants also listed Audit Firm 2 next to "Accounting" on Performance Sheets in June and November 2021. In reality, neither EIA nor the Fund has ever been a client of Audit Firm 1 or 2.

92.     Beginning in at least December 2021, EIA and Middlebrooks began representing in Performance Sheets and Investor Presentations that Audit Firm 3 was the Fund's auditor. While Middlebrooks did sign an engagement letter with

Audit Firm 3 in August 2021 on behalf of EIA for an audit of the Fund, Audit Firm 3 performed no audit work for EIA or the Fund.

93.   A reasonable investor would have understood from the disclosures referenced above that the Fund had retained audit firms to audit its financial statements.

94.   Each of the above disclosures regarding audit firms purportedly engaged to audit the Fund's financial statements were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading.

95.   The above misrepresentations regarding audit firms purportedly engaged to audit the Fund's financial statements were material to investors and potential investors because a reasonable investor would consider whether the Fund's financial statements were audited when assessing the reliability of representations regarding the Fund's financial condition and performance. Further, it was important to investors that the Fund's financials were audited by an independent accounting firm, as evidenced by Declarant Investor 1 asking if the Fund was audited and requesting audited financial statements and an audit report.

**E.    Defendants Made False and Misleading Statements about the Fund's Purported Advisory Board.**

96.    Defendants also made misrepresentations about the existence of a purported advisory board to the Fund in the Investor Presentations during the Relevant Period.

97.    Investor Presentations disseminated to investors and potential investors represented that the Fund had a five or six member advisory board comprised of individuals with significant experience in the financial and investment industries, and included a photograph and narrative background for each member.

98.    At least three of the purported members never served on the advisory board.

99.    A reasonable investor would have understood from the representations concerning the Fund advisory board that the experienced individuals listed as members of the Fund advisory board were in fact members of the Fund's advisory board.

100.    Each of the above disclosures was false when made, and Defendants knew or were reckless in not knowing, and should have known, that their

statements were false and misleading, because at least three purported members of the Fund advisory board never served on the board.

101.    The above misrepresentations regarding members of the Fund advisory board were material to investors and potential investors because, among other reasons, the purported presence of a Fund advisory board comprised of experienced investment professionals indicated that the Fund was well established and bolstered the appearance that the Fund was legitimate and successful.

## III.    DEFENDANTS ENGAGED IN ADDITIONAL FRAUDULENT AND DECEPTIVE CONDUCT, INCLUDING FORGING DOCUMENTS TO MISLEAD INVESTORS.

102.    In addition to the material misrepresentations and omissions, which are fraudulent and deceptive conduct, Defendants engaged in numerous additional instances of conduct that acted as a fraud and deceit on investors. In engaging in the fraudulent and deceptive conduct, Middlebrooks acted as an agent of EIA and his conduct is imputed to EIA. Defendants acted at least recklessly and negligently in engaging in the fraudulent and deceptive conduct described below.

### A.    Middlebrooks Created and Disseminated Fraudulent Audit Reports.

103.    To further his fraud, Middlebrooks fabricated financial statements for the Fund and a related audit report for year-end 2020 that he then provided to investors and prospective investors in early 2022.

36

104.    Middlebrooks sent the purportedly audited Fund financial statements and an audit report for year-end 2020 to investors and prospective investors in early 2022.

105.    The audit report distributed with the financial statements was purportedly issued by an audit firm, Audit Firm 3, that never conducted any audit work related to the financial statements of the Fund.

106.    Middlebrooks requested an engagement proposal from Audit Firm 3 in August 2021 as well as "templates of the reports and statements" used by Audit Firm 3 and a "sample of a completed audit."

107.    In response, Audit Firm 3 provided Middlebrooks with an engagement proposal for audit and tax work for the Fund, as well as watermarked draft templates of an incomplete audit report and financial statement spreadsheet.

108.    Middlebrooks executed and returned a signature page for the engagement letter on August 31, 2021. Audit Firm 3 last heard from Middlebrooks on September 1, 2021. Audit Firm 3 never did any work on, let alone completed, an audit of the financial statements for the Fund, nor did Audit Firm 3 create or issue any draft or final audit reports related to any such audits.

109.    Middlebrooks took the documents he received from Audit Firm 3, fabricated audited Fund financial statements and a December 31, 2020 year-end

audit report, and provided this fake report and falsified financial statements to at least one prospective investor and at least three current investors, including two of whom subsequently invested in March 2022 after receiving the fabricated audit report and financial statements.

### B. Defendants Made Ponzi-Like Payments to Conceal and Perpetuate Their Fraud.

110.   Middlebrooks, through EIA, made approximately $9.5 million in Ponzi-like payments during the Relevant Period to existing investors seeking return of their investments.

111.   Investors invested $39 million in the Fund. The Fund sent approximately $31 million of investor monies to Fund and EIA brokerage accounts or other investments. Of that $31 million, the investment accounts returned $3.6 million back to EIA's bank account, and incurred approximately $27 million in losses. EIA and Middlebrooks took at least $1.6 million out for reasons not permitted by the Fund documents. At most, EIA only received about $640,000 from non-investor sources. Yet, EIA paid $9.5 million back to investors.

112.   During the Relevant Period, some investors sought to redeem their investments. In order to avoid disclosing that their investment had been misappropriated or lost, Defendants redeemed those investments, paying the phony

returns they had claimed. But, as the investment had been misappropriated or lost, Defendants redeemed these investors' investments by making Ponzi-like payments to them, providing them not with their principal and actual returns, but money invested by later investors.

113.   During the Relevant Period that Middlebrooks, through EIA, made various payments to existing investors, the Fund had incurred significant trading losses and often did not have sufficient assets from sources other than new investor money to make the payments.

114.   For example, records show that an investor initially invested $150,000 in the Fund in January 2021. In March 2022, this investor fully redeemed and received $238,174.  Based on the Fund's trading records, which showed cumulative losses, the amount paid in excess of $150,000 was a Ponzi-like payment comprised of other investors' money. And since the overall performance of the Fund was negative, a substantial portion of the original $150,000 principal returned to this investor is also a Ponzi-like payment.

115.   By way of another example, on March 31, 2022, an investor wired $1 million into EIA's bank account. Prior to that deposit, EIA's bank account balance was $768,341. The investor's funds were not transferred to any of the Fund's or EIA's brokerage accounts. On April 4, 2022, $1,218,121 was paid to another

investor. While there were two other intervening deposits on March 31 and April 4

totaling $80,000, the $1,218,121 payment to the investor on April 4, 2022, could

not have been made without using some of the funds deposited by the investor on

March 31, 2022.

116.  Defendants knew or were reckless in not knowing, and should have

known, that by making Ponzi-like payments to investors, they were engaging in

fraudulent and deceptive conduct. Middlebrooks had full knowledge of and control

over EIA's bank accounts and knew the Fund did not have sufficient assets from

sources other than new investor money to make payments to investors seeking

return of their investments.

**C.    Defendants Submitted False Documents and Information to Obtain Awards on False Pretenses.**

117.  In January 2018, Middlebrooks submitted documents and information

to a hedge fund data service that markets itself as providing funds exposure to over

170,000 fund managers, investors, placement agents, service providers, advisors,

and other industry professionals from more than 48,000 firms worldwide.

118.  The documents Middlebrooks submitted include a Q4 2017

Performance Sheet and an (undated) executive summary, which did not accurately

reflect the Fund's performance.

119.   After January 2018, Middlebrooks continued to submit false performance information to the hedge fund data service. These documents include an April 2018 Performance Sheet and a November 2021 Performance Sheet, which did not accurately reflect the Fund's performance.

120.   Based on the false performance information submitted by Middlebrooks, the hedge fund data service awarded the Fund certain accolades, such as "Top Performing Hedge Fund" in the "Relative Value Strategies" and "Volatility Trading" categories for "Jan. 2017 – Dec. 2019."

121.   Defendants advertised these awards on EIA's website, on Middlebrooks's LinkedIn account, in Middlebrooks's email signature blocks (included in Middlebrooks's emails to investors), and in virtually every Performance Sheet and Investor Presentation.

122.   Information about the top rankings from the hedge fund data service were material to investors and potential investors because, among other things, investors consider an adviser's historical performance – particularly in relation to an adviser's peers – to be relevant to the probability that an adviser may perform well in the future.

## IV.   THE LIMITED PARTNERSHIP INTERESTS ARE SECURITIES.

123.   The limited partnership interests in the Fund that the Defendants offered and sold to investors are securities as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." An investment contract exists where a person invests his or her money, in a common enterprise, with a reasonable expectation of profits to be derived solely from the efforts of others.

124.   The limited partnership interests in the Fund were investment contracts.

125.   The Fund investors made an investment of money into the Fund, receiving limited partnership interests, and those funds were pooled with other investors' funds. The Fund then retained EIA, controlled by Middlebrooks, to manage investors' funds that had been invested into the Fund.

126.   The investments were part of a common enterprise whereby Defendants commingled the investments with other investor money in EIA's bank accounts and also the Fund's brokerage accounts and traded the money in pooled accounts to execute their trading strategy and make profits for the investors, the Fund, and themselves.

127.   The investors' investment of money was passive and they expected profits to be derived solely from the efforts of the Defendants through their purported investment strategies. EIA was the sole general partner in the Fund and, per the LPA, had "the exclusive right to manage and control the affairs of the [F]und." And Middlebrooks controlled, was the sole owner, and member-manager of EIA and also the Portfolio Manager for EIA, who, per the PPM, managed the Fund's securities portfolios. As such, investors expected profits to be derived solely from the efforts of others, namely Middlebrooks and EIA.

128.   Moreover, the limited partnership interests were explicitly described as "securities" in the PPM and LPA, which also described that investors would be making an "investment."

## V.   DEFENDANTS BREACHED THEIR FIDUCIARY OBLIGATIONS AND VIOLATED THE ADVISERS ACT.

129.   Middlebrooks and EIA are both investment advisers within the meaning of Section 202(a)(11) of the Advisers Act. 15 U.S.C. § 80b-2(a)(11). Defendants advised the Fund as to the specific investments to make, controlled the purchase and sale of securities held by the Fund, and otherwise made investment decisions for the Fund.

130.   Middlebrooks was the owner and portfolio manager of EIA and, per the PPM, was responsible for "managing the Fund's securities portfolio and operations on behalf of" EIA. Middlebrooks received compensation for his investment adviser services to the Fund, including advising the Fund as to the advisability of investing in, purchasing, or selling securities.

131.   As investment advisers to the Fund, Defendants owed a fiduciary obligation to the Fund. As such, Defendants owed the Fund an affirmative duty of utmost good faith, had an affirmative obligation to employ reasonable care to avoid misleading the Fund, had a duty to act in the Fund's best interest, and were obligated to provide full and fair disclosure of all material facts, including a duty to tell it about all actual or potential conflicts of interest that might incline them to render investment advice that was not disinterested.

132.   The Fund is a pooled investment vehicle. The Fund is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities, and it is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities and more than 40% of the value of its assets consists of "investment securities," as defined in the Investment Company Act of 1940. Additionally, there was a public offering of the limited partnership interests and the Fund has more

44

than 100 investors. Middlebrooks also was the sole control person and managing

member of EIA. Further, Defendants received or expected to receive compensation

for their investment adviser services to the Fund.

133.   As alleged herein, Defendants breached their fiduciary duties by,

among other things, misappropriating Fund assets, and misusing Fund assets to

make Ponzi-like payments. The misuse of Fund assets was contrary to the Fund's

offering documents

134.   EIA and Middlebrooks also made repeated false statements and

misrepresentations to investors and prospective investors in the Fund, a pooled

investment vehicle, including the false statements discussed above in the

Performance Sheets, Investor Presentations, and monthly investor account

statements. Additionally, EIA and Middlebrooks engaged in other fraudulent and

deceptive conduct with respect to investors and prospective investors in the Fund, a

pooled investment vehicle, including falsifying documents such as the financial

statements and audit report, misappropriating investor assets and making Ponzi-

like payments.

## VI.   MIDDLEBROOKS AIDED AND ABETTED EIA'S VIOLATIONS OF THE ADVISERS ACT.

135.   Middlebrooks also aided and abetted EIA's violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly providing substantial assistance to EIA.

136.   In addition, Middlebrooks also aided and abetted EIA's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to EIA.

137.   As described further above, Middlebrooks knowingly or recklessly substantially participated in these violations by, among other things, controlling EIA and being the individual who orchestrated the fraud, misappropriating investors' funds, directing Ponzi-like payments to investors, making and/or approving false statements to investors, and creating fabricated documents.

## VII.   RELIEF DEFENDANTS RECEIVED PROCEEDS FROM DEFENDANTS' FRAUD TO WHICH THEY HAVE NO LEGITIMATE CLAIM.

138.   As alleged above, each of the Relief Defendants received proceeds from Defendants' fraud for which they provided no reciprocal goods or services, and to which they have no legitimate claim.  As a result, those funds should be returned to defrauded investors.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Section 17(a) of the Securities Act
(All Defendants)

139.   The SEC realleges and incorporates by reference the above

paragraphs 1 through 138 as though fully set forth herein.

140.   Defendants, directly or indirectly, in the offer or sale of securities by

the use of means or instruments of transportation or communication in interstate

commerce or by use of the mails, acting with the requisite state of mind:

(a) employed devices, schemes, or artifices to defraud; (b) obtained money or

property by means of untrue statements of a material fact or by omitting to state a

material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaged in

transactions, practices, or courses of business which operated or would operate as a

fraud or deceit upon the purchaser.

141.   By engaging in the conduct described above, Defendants violated, and

unless restrained and enjoined will continue to violate, Section 17(a) of the

Securities Act. 15 U.S.C. §§ 77q(a).

**Second Claim for Relief**
**Section 10(b) and Rule 10b-5 of the Exchange Act**
(All Defendants)

142.   The SEC realleges and incorporates by reference above paragraphs 1 through 141 as though fully set forth herein.

143.   Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

144.   By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**Third Claim for Relief**
**Sections 206(1) and 206(2) of the Advisers Act**
(All Defendants)

145. The SEC realleges and incorporates by reference the above paragraphs 1 through 144 as though fully set forth herein.

146. Defendants are investment advisers as defined by Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

147. Defendants, while acting as investment advisers, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, acting with the requisite state of mind: (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

148. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

**Fourth Claim for Relief**
**Aiding and Abetting Violations of**
**Sections 206(1) and (2) of the Advisers Act**
(Alternatively, Against Middlebrooks)

149.   The SEC realleges and incorporates by reference above paragraphs 1
through 148 as though fully set forth herein.

150.   Defendant EIA violated Sections 206(1) and (2) of the Advisers Act,
15 U.S.C. § 80b-6(1) & (2).

151.   As a result of the conduct alleged herein, Middlebrooks aided and
abetted Defendant EIA's violations of Sections 206(1) and (2) of the Advisers Act
by knowingly or recklessly providing substantial assistance to EIA which, while
acting as an investment adviser, by the use of the mails or any means or
instrumentality of interstate commerce, directly or indirectly:

   a.   employed a device, scheme, or artifice to defraud; or

   b.   engaged in a transaction, practice, or course of business which
        operated as a fraud or deceit upon a client or prospective client, as
        more particularly described above.

152.   By virtue of the foregoing, Middlebrooks, directly or indirectly, aided
and abetted and, unless enjoined, will again aid and abet violations of Sections
206(1) and (2) of the Advisers Act, 15 U.S.C. § 80b-6(1) & (2).

**Fifth Claim for Relief**
**Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**
(All Defendants)

153.   The SEC realleges and incorporates by reference the above

paragraphs 1 through 152 as though fully set forth herein.

154.   At all times relevant to the Complaint, Defendants acted as investment

advisers to the Fund, which is a pooled investment vehicle as defined in Rule

206(4)-8(b), 17 C.F.R. § 275.206(4)-8(b). Defendants, while acting as investment

advisers to a pooled investment vehicle, by use of the mails or any means or

instrumentality of interstate commerce, directly or indirectly engaged in acts,

practices, or courses of business which were fraudulent, deceptive, or

manipulative. Defendants, directly or indirectly:

  a.  made untrue statements of material fact and omitted to state material

      facts necessary to make statements made, in the light of the

      circumstances under which they were made, not misleading, to

      investors and prospective investors in a pooled investment vehicle; or

  b.  otherwise engaged in acts, practices, or courses of business that were

      fraudulent, deceptive, or manipulative with respect to investors or

      prospective investors in a pooled investment vehicle.

155.   By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(2), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8, thereunder.

**Sixth Claim for Relief**
**Aiding and Abetting Violations of**
**Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**
(Alternatively, Against Middlebrooks)

156.   The SEC realleges and incorporates by reference the above paragraphs 1 through 155 as though fully set forth herein.

157.   As a result of the conduct alleged herein, Middlebrooks aided and abetted EIA's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to EIA who, while acting as an investment adviser to a pooled investment vehicle, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

     a.  made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; or

    b.   otherwise engaged in acts, practices, or courses of business that were

fraudulent, deceptive, or manipulative with respect to investors or

prospective investors in a pooled investment vehicle.

158.   By virtue of the foregoing, Middlebrooks, directly or indirectly, aided

and abetted and, unless enjoined, will again aid and abet violations of Section

206(4) of the Advisers Act, 15 U.S.C. § 80b-6(2), and Rule 206(4)-8, 17 C.F.R.

§ 275.206(4)-8, thereunder.

## Seventh Claim for Relief
**Disgorgement from Relief Defendants – Pursuant to Section 6501 of the**
**National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283**
**and Equitable Principles**
(Relief Defendants the Fund, EIA II, and Shop Style)

159.   The SEC realleges and incorporates by reference the above

paragraphs 1 through 158 as though fully set forth herein.

160.   Each Relief Defendant obtained money, property, and assets that are

the proceeds, or are traceable to the proceeds, of the fraud and violations of the

securities laws by Defendants.

161.   Each Relief Defendant has no legitimate claim to these illicit

proceeds, having obtained the funds under circumstances in which it is not just,

equitable, or conscionable for it to retain the funds or assets, and therefore each of

them has been unjustly enriched.

## **RELIEF REQUESTED**

**WHEREFORE**, the SEC respectfully requests that this Court:

### **I.**

Find that the Defendants committed the violations alleged in this Complaint;

### **II.**

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him or it, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder, and Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8;

## III.

Order Defendants, jointly and severally, and the Relief Defendants to disgorge ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

## IV.

Order Defendants to pay third-tier civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e); and

## V.

Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Dated:  May 18, 2022                    Respectfully submitted,

                              By:   *s/ Zachary T. Carlyle*
                                    Zachary T. Carlyle
                                    Kenneth E. Stalzer
                                    U.S. Securities and Exchange
                                    Commission
                                    1961 Stout Street, Suite 1700
                                    Denver, CO 80294-1961
                                    Telephone: 303.844.1084 (Carlyle)
                                              303.844.1055 (Stalzer)
                                    Email:      carlylez@sec.gov
                                                stalzerk@sec.gov
                                    *Attorneys for Plaintiff*
                                    *U.S. Securities and Exchange*
                                    *Commission*

                                    Local Counsel For Plaintiff
                                    DAWN N. ISON
                                    United States Attorney

                                    Susan K. DeClercq (P60545)
                                    Assistant United States Attorney
                                    U.S. Attorney's Office – Eastern
                                    District of Michigan
                                    211 West Fort Street, Suite 2001
                                    Detroit, Michigan 48226
                                    (313) 226-9149
                                    (313) 226-3271 (facsimile)
                                    Susan.declercq@usdoj.gov